**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| PRISCILLA PLASS, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:13CV1023 ACL** |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Priscilla Plass for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff filed a Brief in support of the Complaint. [Doc. 15] Defendant filed a Brief in Support of the Answer. [Doc. 22]

## Procedural History

On June 5, 2012, Plaintiff filed applications for Disability Insurance Benefits and Supplemental Security Income, claiming that she became unable to work due to her disabling condition on August 5, 2011. (Tr. 158-165.) These claims were denied initially. (Tr. 92-96) Following an administrative hearing, Plaintiff's claims were denied in a written opinion by an Administrative Law Judge (ALJ), dated February 22, 2013. (Tr. 11-22.) The Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security

Administration (SSA), which was denied on March 29, 2013. (Tr. 5, 1-4.) Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

**A.    ALJ Hearing**

Plaintiff's administrative hearing was held on February 4, 2013. (Tr. 29.) Plaintiff was present and represented by counsel. Id. Also present was vocational expert James Israel. Id.

Plaintiff's attorney made an opening statement, in which he argued that Plaintiff suffers from bipolar effective disorder, personality disorder, and anxiety, which prevent her from sustaining the mental demands of work on an ongoing basis. (Tr. 32.)

The ALJ questioned Plaintiff, who testified that she was thirty years of age. Id. Plaintiff stated that she was single and did not have any children. (Tr. 33.)

Plaintiff testified that she had recently received an eviction notice due to failure to pay rent, but that her landlord agreed to allow her additional time to move after learning her administrative hearing had been moved up. Id.

Plaintiff has a valid driver's license, but she does not drive unless she has to because she experiences anxiety and difficulty focusing when driving; she drives once or twice a week. (Tr. 34.) Plaintiff testified that she drove herself to the hearing and it was "a little rough." (Tr. 35.)

Plaintiff stated that she graduated from high school and obtained a cosmetology license. Id.

Plaintiff testified that, since August of 2011, she worked at Steak and Shake for about three days; Jack in the Box for four to five weeks; and Hardy's for about one month. (Tr. 36.) Plaintiff explained that she had to keep a normal schedule at these positions, because too much fluctuation affected her sleep and her medication schedule. Id.

2

Plaintiff testified that she had been receiving Missouri Medicaid benefits for three to four years.  (Tr. 37.)

Plaintiff stated that she worked as a stylist at a Great Clips on a couple occasions.  Id. Plaintiff testified that the positions ended due to her mental impairments.  Id.  Plaintiff stated that her psychiatrist requested that her employer allow her to keep a more regular schedule, but her employer did not honor that request.  Id.  Plaintiff stated that she also had difficulty dealing with the public.  Id.  Plaintiff testified that her manager eventually told her that she should pursue other work not requiring interaction with the public.  (Tr. 38.)

Plaintiff stated that she worked nights as a cook at Steak and Shake.  Id.  Plaintiff testified that she thought the night shift would be easier due to less people being around, but it ended up being more difficult for her.  Id.

Plaintiff stated that she worked as a server at O'Charley's.  (Tr. 39.)  Plaintiff testified that she had to take leaves of absences from this position due to medical problems and an inability to work while taking certain medications.  Id.  When she returned from medical leave, Plaintiff was terminated; her supervisor told her she was too unstable to work.  (Tr. 40.)

Plaintiff testified that she would be unable to perform any of her past work at the time of the hearing due to her anxiety, mood changes, and inability to interact with people.  Id.  Plaintiff stated that she had to take frequent breaks at her past positions to maintain her composure, and she occasionally had to leave the job site.  Id.

Plaintiff's attorney next questioned Plaintiff, who testified that she experiences episodes of anxiety or panic attacks approximately four times a day for periods ranging from twenty minutes to three to four hours.  (Tr. 41.)  Plaintiff stated that she has to lie down and rest after experiencing

an episode.   Id.

Plaintiff testified that she does not bathe daily.   (Tr. 42.)   According to Plaintiff, she sometimes bathes only once a week, because it is a "hard task" to get in the shower.   Id.

Plaintiff testified that she has crying spells up to four times a day, which last between thirty minutes and a "couple hours."   Id.

Plaintiff stated that she is frequently distracted due to her anxiety; she constantly checks things, such as checking the creases in towels and checking to make sure she flushes the toilet. (Tr. 43.)

Plaintiff testified that she went to St. Anthony's in August of 2012, because she experienced a severe anxiety attack.   Id.   Plaintiff stated that the Klonopin[1] she takes occasionally works, and sometimes it is ineffective.   Id.   Plaintiff testified that she went to the hospital, because she was experiencing a panic attack along with the "rushing thoughts" of a "high mood."   Id.   Plaintiff described her "rushing thoughts" as making her unable to sit down or get a "clear head," because she is thinking too much.   (Tr. 44.)   She indicated they occur approximately twice a week and can last for hours unless she goes to the hospital.   Id.

Plaintiff stated that she would like to undergo trans-cranial magnetic stimulation ("TMS"),[2] which is a new procedure similar to electroconvulsive therapy ("ECT"),[3] but less

_____

[1] Klonopin is indicated for the treatment of panic disorder.   Physician's Desk Reference (PDR), 2639 (63rd Ed. 2009).

[2] TMS uses a magnet (instead of the electrical current used in electroconvulsive therapy) to activate the brain to treat depression, psychosis, and other disorders.   Clinical trials studying the effectiveness of TMS revealed mixed results.   In 2008, it was approved for use by the FDA as a treatment for major depression for patients who have not responded to at least one antidepressant medication.   A recent study found that most side effects were mild or moderate, although long-term side effects are unknown.   National Institute of Mental Health, http://www.nimh. nih.gov/health/topics/brain-stimulation-tl (last visited September 23, 2014).

[3] ECT involves placing electrodes at precise locations on the head while a patient is sedated with

4

invasive and involving no permanent side effects.   Id.   Plaintiff testified that Medicaid will not pay for TMS, but she is in the process of appealing this decision.   (Tr. 45.)   Plaintiff stated that Medicaid would pay for ECT even though it is much more expensive than TMS therapy.   Id. Plaintiff testified that her psychiatrist, Dr. Steve Stromsdorfer, recommended TMS in October of 2012 because she had tried many medications and they had been ineffective.   Id.

The ALJ next examined the Vocational Expert (VE), who testified that Plaintiff's past fast food work is classified as unskilled and light, although Plaintiff's testimony suggests she did some medium lifting at the positions.   (Tr. 46.)   Mr. Israel stated that Plaintiff's work as a server is classified as semi-skilled and light; and her work as a cosmetologist is classified as skilled and light.   (Tr. 47.)

The ALJ asked the VE to assume a hypothetical claimant with Plaintiff's background and the following limitations: occupations that involve only simple, routine, and repetitive tasks in a low-stress job; only occasional decision-making required and occasional changes in the work setting; occasional judgment required on the job; no interaction with the public; only casual and infrequent interaction with co-workers; and contact with supervisory staff concerning work duties occurring no more than four times per workday when work duties are being performed up to expectations.   (Tr. 48.)   The VE testified that the claimant would be unable to perform any of Plaintiff's past work.   Id.   The VE stated that the individual would be capable of performing other jobs, such as assembler (3,100 positions in Missouri); bulk packer (1,700 positions in Missouri); and product inspector (1,150 positions in Missouri).   (Tr. 49.)

---

general anesthesia.   Through the electrodes, an electric current passes through the brain, causing a seizure that lasts generally less than one minute.   ECT was first developed in 1938, and had a poor reputation for many years, but the procedure has improved significantly since its initial use. National Institute of Mental Health, http://www.nimh.nih.gov/health/topics/brain-stimulation-tl (last visited September 23, 2014).

The ALJ next asked the VE to assume a hypothetical individual who needed contact with supervisory staff to be limited to no more than three times per workday. (Tr. 50.) The VE testified that this restriction would not affect the individual's ability to perform the jobs he listed. Id.

The ALJ asked the VE to assume a hypothetical individual who was limited to occupations where production quotas are based on end of the workday measurements only. Id. The VE testified that, of the positions he named, approximately 75 percent base production quotas on end of workday measurements. Id.

The VE testified that employers customarily tolerate no more than one unexcused absence per month. (Tr. 52.)

Plaintiff's attorney examined the VE, who testified that an individual who missed twenty percent of the workday due to unscheduled breaks, panic attacks, or crying spells, would not be capable of retaining a job. (Tr. 52-53.)

**B.** **Relevant Medical Records**

Plaintiff presented to therapist Peggy DeGroot, MA, LPC, at Comtrea, for an Initial Assessment on September 21, 2010. (Tr. 343-345.) Plaintiff reported that she had been diagnosed with bipolar disorder and anxiety, and had received treatment at Comtrea in the past. (Tr. 343.) Plaintiff was not comfortable with her current psychiatrist, and wished to resume treatment at Comtrea. Id. Plaintiff complained of mood swings and anxiety. Id. Upon examination, Plaintiff's mood was depressed and anxious; and her affect was sad and depressed. Id. Ms. DeGroot diagnosed Plaintiff with bipolar disorder, and generalized anxiety disorder; and

assessed a GAF score[4] of 54.[5]   (Tr. 345.)   Ms. DeGroot referred Plaintiff to a psychiatrist.   Id.

Plaintiff presented to psychiatrist Steve C. Stromsdorfer, M.D., on October 14, 2010, to resume psychiatric care.   (Tr. 308.)   Plaintiff had been receiving psychiatric care for ten years, but had to change psychiatrists when she started receiving Medicaid benefits.   Id.   Plaintiff reported mood swings with emphasis on prominent irritability, erratic sleep, variable energy, racing thoughts, and much conflict with relatives.   Id.   Plaintiff was taking Paxil,[6] Trileptal,[7] and Klonopin.   Id.   Plaintiff reported a history of depression and mood swings since the age of eighteen, and use of multiple psychotropic medications.   Id.   Plaintiff was working at Great Clips and reported no particular difficulty with doing her job, although she had lost jobs in the past due to her mood lability.   (Tr. 309.)   Upon mental status examination, Plaintiff's flow of thought was logical; her mood was depressed, rated as a four to five on a scale of one to ten; her anxiety level was rated as a nine; her affect was described as mildly depressed and slightly anxious without lability; and her concentration and memory were fair.   Id.   Dr. Stromsdorfer diagnosed Plaintiff with bipolar I disorder,[8] most recently depressed phase; with a current GAF score of 60.   (Tr. 308.)   Dr. Stromsdorfer decreased Plaintiff's dosage of Paxil as it was not effective, and started

---

[4] The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations."   Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[5] A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."   DSM-IV at 32.

[6] Paxil is an antidepressant indicated for the treatment of major depressive disorder, panic disorder, and generalized anxiety disorder.   See PDR at 1536-37.

[7] Trileptal is indicated for the treatment of seizure disorders.   See WebMD, http://www.webmd.com/ drugs (last visited September 23, 2014).

[8] An affective disorder characterized by the occurrence of alternating (e.g., mixed, manic, and major depressive episodes.   Stedman's Medical Dictionary, 568 (28th Ed. 2006).

her on Zoloft.[9]   (Tr. 309.)

Plaintiff saw Dr. Stromsdorfer approximately monthly, at which time he adjusted Plaintiff's medications.   On December 16, 2010, Plaintiff's anxiety was "very high."   (Tr. 306.) Dr. Stromsdorfer assessed a GAF score of 55, and adjusted Plaintiff's medications.   Id. Plaintiff's mood continued to be "disturbed" on December 27, 2010, and January 17, 2011.   (Tr. 305, 304.)

Plaintiff saw Ms. DeGroot on January 17, 2011, to formulate a treatment plan.   (Tr. 334.) Ms. DeGroot recommended that Plaintiff continue with supportive case management every four to eight weeks as needed.   Id.

Plaintiff presented to Dr. Stromsdorfer on February 7, 2011, at which time her mood was somewhat better, but her anxiety remained high.   (Tr. 303.)   Plaintiff had difficulty accomplishing tasks if her workload exceeded 25 hours, and she had obsessional thoughts about being perfect on her tasks.   Id.   Dr. Stromsdorfer assessed a GAF score of 60.   Id.   On April 18, 2011, Plaintiff's depression and anxiety were "doing poorly."   (Tr. 301.)   Plaintiff was having crying spells, and significant conflict was occurring within her marriage.   Id.   On May 9, 2011, Plaintiff continued to experience distress.   (Tr. 300.)   The frequent changes in the shifts she worked were interfering with her sleep, and her focus was off.   Id.   Dr. Stromsdorfer advised Plaintiff to obtain a set work schedule, and indicated that he would provide support for her employer.   Id.   Plaintiff's anxiety and depression were high on June 9, 2011.   (Tr. 299.) Plaintiff reported that her nephew died accidentally of uncertain causes, her mother was doing very poorly, and her work schedule was demanding.   Id.   On June 30, 2011, Plaintiff's depression and

---

[9] Zoloft is indicated for the treatment of depression.   See WebMD, http://www.webmd.com/ drugs (last visited September 23, 2014).

anxiety were "somewhat better" since increasing her dosage of Paxil.  (Tr. 297.)

Plaintiff presented to Dr. Stromsdorfer on July 28, 2011, at which time she reported her anxiety had been "very bad," which had caused her to leave work at times as well as present to an urgent care center for treatment.  (Tr. 296.)  Upon examination, Plaintiff was very depressed, anxious, and tearful at times, with lability "somewhat evident."  Id.  Plaintiff's focus was "somewhat impaired," and her memory was fair.  Id.  Dr. Stromsdorfer diagnosed Plaintiff with bipolar I disorder, and personality disorder not otherwise specified (histrionic and passive-aggressive traits); and assessed a GAF score of 50.[10]  Id.  Dr. Stromsdorfer adjusted Plaintiff's medications, and advised her to take a leave of absence from work.  Id.

Plaintiff saw Whitney Connor, M.A., at Comtrea on July 28, 2011.  (Tr. 332.)  Plaintiff was upset and confused about paperwork Dr. Stromsdorfer asked her to complete for her employer.  Id.  Plaintiff was tearful, extremely angry, and had limited affect control.  Id.  Plaintiff was concerned about losing her job due to needing time off to handle her medication transition.  Id.  Ms. Connor explained the paperwork to Plaintiff, and Plaintiff was receptive. Id.

On September 8, 2011, Dr. Stromsdorfer noted that Plaintiff's depression and anxiety continued.  (Tr. 295.)  Plaintiff reported that she was no longer working.  Id.  Plaintiff had not started Effexor,[11] which was prescribed at her last visit, because she had concerns about possible side effects.  Upon examination, Plaintiff' depression and anxiety were "high severity."  Id. Plaintiff's affect was depressed and very tense, consistent with her mood; Plaintiff's focus was

[10] A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV at 32.
[11] Effexor is an antidepressant drug indicated for the treatment of major depressive disorder and generalized anxiety disorder.  See PDR at 3195-96.

decreased, and her memory was impaired.   Id.   Dr. Stromsdorfer's diagnosis remained

unchanged.   Id.   He stated that, overall, dysphoria persisted without improvement.   Id.   Dr.

Stromsdorfer confronted Plaintiff about her "significant ambivalence to utilizing antidepressants."

Id.   He prescribed Celexa,[12] Trileptal, Klonopin, and Paxil.   Id.

On September 20, 2011, Plaintiff reported fogginess and manic feelings with the reduction

of Paxil, along with starting Celexa.   (Tr. 294.)   Plaintiff's loss of job was a source of "major

stress."   Id.   Upon examination, Plaintiff's depression and anxiety were of high severity.   Id.

Dr. Stromsdorfer stated that overall, there was no improvement; he stopped the Celexa, continued

Paxil and Klonopin, and started Cymbalta.[13]   Id.

On October 13, 2011, Plaintiff's mood was "slightly better."   (Tr. 293.)   Plaintiff

reported looking for a job.   Id.   Upon examination, Plaintiff's depression and anxiety were

"fairly high severity," and her affect was depressed and tense.   Id.   Dr. Stromsdorfer noted

"slight improvement in dysphoria."   Id.   He continued Plaintiff's medications.   Id.

Plaintiff saw Ms. Connor on October 13, 2011, after seeing Dr. Stromsdorfer.   (Tr. 330.)

Plaintiff stated that she wanted to be stable, and wanted to find the right medications.   Id.

Plaintiff appeared "extremely depressed."   Id.   Plaintiff reported that she was struggling with

being unemployed and was having difficulty finding a job.   Id.   Plaintiff was "receptive to

becoming involved in therapeutic services."   Id.

Plaintiff saw Bradley Kinnear, LPC, at Comtrea on November 14, 2011, for counseling.

(Tr. 327.)   Plaintiff reported a ten-year history of mood swings and anxiety.   Id.   Plaintiff

suggested a topic for counseling would be "her anger over two abortions she had to have because

---

[12] Celexa is an antidepressant drug indicated for the treatment of depression. See PDR at 1161.
[13] Cymbalta is indicated for the treatment of major depressive disorder and generalized anxiety
disorder. See PDR at 1801.

of her medications". <u>Id.</u>

Plaintiff presented to Dr. Stromsdorfer on November 14, 2011, at which time her stress and mood swings were noted to be high. (Tr. 292.) Upon examination, Plaintiff's depression and anxiety continued with fluctuation; and her affect was "somewhat depressed, anxious, not labile." <u>Id.</u> Dr. Stromsdorfer assessed a GAF score of 55, and stated Plaintiff was doing "slightly better" overall. <u>Id.</u> Dr. Stromsdorfer increased Plaintiff's dosage of Paxil, and continued the Klonopin and Trileptal. <u>Id.</u>

Plaintiff saw R. Kinnear for counseling on November 28, 2011, at which time she reported feeling significant anxiety. (Tr. 323.) Plaintiff reported experiencing more difficulty the past couple weeks due to life stressors, including looking for a job. <u>Id.</u> On December 5, 2011, Plaintiff reported that she was waiting to hear about a potential job opportunity. (Tr. 321.) She reported difficulty sleeping and had not taken her medication prior to her appointment. <u>Id.</u>

Plaintiff presented to Dr. Stromsdorfer on December 12, 2011, at which time her mood remained "highly upset," with no change since increasing the dosage of Paxil. (Tr. 291.) Plaintiff reported that her finances were strained, and she was waiting to hear if she would obtain a job at Steak and Shake. <u>Id.</u> Upon examination, Plaintiff's depression and anxiety were high; her affect was depressed, very tense, and tearful. <u>Id.</u> Dr. Stromsdorfer continued Plaintiff's medications. <u>Id.</u>

On January 6, 2012, Plaintiff called Mr. Kinnear to inform him she was discontinuing counseling indefinitely. (Tr. 317.) Plaintiff reported she started a new job, and Dr. Stromsdorfer increased her dosage of Abilify.[14] <u>Id.</u> Plaintiff reported that she was struggling with her

---

[14] Abilify is an antipsychotic drug indicated for the treatment of bipolar disorder and major depressive disorder. <u>See</u> <u>PDR</u> at 881.

11

symptoms, but stated that "[w]ith everything going on, I just don't think I can handle working on counseling."  Id.

On January 12, 2012, Plaintiff's mood swings continued.  (Tr. 290.)  Dr. Stromsdorfer noted that Plaintiff had called in because she felt overwhelmed; he recommended that Abilify be added to Plaintiff's prescription regimen.  Id.  Plaintiff expressed anxiety regarding starting Abilify due to side effects she had experienced in the past.  Id.  Plaintiff was working at Jack in the Box rather than Steak and Shake, which was busier and less organized.  Id.  On examination, Plaintiff's affect was somewhat depressed and tense.  Id.  Dr. Stromsdorfer assessed a GAF score of 60, and added Abilify.  Id.

On January 26, 2012, Plaintiff's mood was about the same.  (Tr. 289.)  Plaintiff's dysphoria was slightly better, but largely continuing.  Id.  Dr. Stromsdorfer stopped Abilify due to reported side effects (nausea), increased Plaintiff's dosage of Trileptal, and continued the Klonopin and Paxil.  Id.

On February 16, 2012, Plaintiff's stress was very high.  (Tr. 288.)  Plaintiff was working multiple shifts with some sleep deprivation.  Id.  Upon examination, Plaintiff was very dysphoric and tearful; her depression and anxiety were high; her affect was depressed, tearful, and tense; and her focus and memory were fair.  Id.  Dr. Stromsdorfer continued Plaintiff's medications.  Id.

On March 8, 2012, Plaintiff's mood was not much better.  (Tr. 287.)  Plaintiff's shift became more steady, but she was not working as much.  Id.  Dr. Stromsdorfer stated that Plaintiff's dysphoria continued, but was somewhat better in degree.  Id.  Dr. Stromsdorfer continued Plaintiff's medications.  Id.

Plaintiff presented to the emergency room at St. Anthony's Medical Center on May 2,

2012, with complaints of increased anxiety and difficulty focusing at work.   (Tr. 351.)   Plaintiff

denied suicidal or homicidal ideations.   Id.

Plaintiff saw Dr. Stromsdorfer on May 14, 2012, at which time she reported continued

mood swings with intermittent crying spells.   (Tr. 286.)   Plaintiff was working the night shift at

Hardee's, which was going "relatively well."   Id.   Upon examination, Plaintiff was somewhat

dysphoric; her depression and anxiety were still up and down somewhat; her affect was somewhat

labile with tearfulness intermittently observed; and her memory and focus were fair.   Id.   Dr.

Stromsdorfer's assessment was "[o]verall, slight improvement in lability."   Id.   He continued

Plaintiff on the Klonopin, Trileptal, and Paxil; and added Latuda.[15]   Id.

On June 14, 2012, Dr. Stromsdorfer indicated that Plaintiff's mood swings remained

prominent.   (Tr. 369.)   Plaintiff's work was overwhelming, and had been discontinued.   Id.

Upon examination, Plaintiff's depression and anxiety were of medium severity; her affect was

depressed, tense, and somewhat tearful; her focus and memory were decreased.   Id.   Dr.

Stromsdorfer continued Plaintiff's medications.   Id.   He indicated that he supported her efforts to

obtain disability.   Id.

On July 12, 2012, Plaintiff's mood was "no better."   (Tr. 368.)   Plaintiff's financial strain

was difficult, and it was impairing her relationship with her significant other.   Id.   Upon

examination, Plaintiff's depression and anxiety were of high severity; her affect was depressed,

and she was significantly tearful and tense.   Id.   Dr. Stromsdorfer assessed a GAF score of 55,

and indicated that Plaintiff was doing poorly overall.   Id.   Dr. Stromsdorfer prescribed Saphris,[16]

---

[15] Latuda is indicated for the treatment of schizophrenia. See WebMD, http://www.webmd.
com/drugs (last visited September 23, 2014).

[16] Saphris is indicated for the treatment of mood disorders, including schizophrenia and bipolar
disorder.   See WebMD, http://www.webmd.com/drugs (last visited September 23, 2014).

and continued Plaintiff's other medications.   Id.

On July 23, 2012, Plaintiff's stress remained very high.   (Tr. 367.)   Financial stressors were prominent, and her car would likely have to be sold soon.   Id.   Plaintiff's husband was concerned about her restarting any medication, so she did not start the Saphris.   Id.   Upon examination, Plaintiff was moderately depressed and anxious, and her affect was somewhat depressed and tense.   Id.   Dr. Stromsdorfer indicated that he would defer starting Saphris for the time being due to the likely conflict within her marriage.   Id.

Plaintiff presented to the emergency room at St. Anthony's Medical Center on August 23, 2012, with complaints of anxiety.   (Tr. 381.)   Plaintiff reported that she had missed her appointment with her psychiatrist, and was experiencing increasing anxiety for the past two weeks. Id.   Plaintiff's medications were not helping.   Id.   Upon examination, Plaintiff was nervous and anxious.   (Tr. 383.)   Plaintiff was diagnosed with anxiety, and was instructed to follow-up with her psychiatrist.   (Tr. 384.)

Plaintiff presented to Dr. Stromsdorfer on August 27, 2012, at which time both depression and anxiety remained high.   (Tr. 366.)   Plaintiff was not showering for several days at a time. Id.   Plaintiff's finances were a source of major stress.   Id.   Plaintiff had not started Saphris.   Id. Upon examination, Plaintiff's affect was depressed and highly anxious; Plaintiff's focus and memory were fair.   Id.   Dr. Stromsdorfer assessed a GAF score of 50, and noted that Plaintiff's dysphoria was "significant."   Id.   Dr. Stromsdorfer started Plaintiff on Saphris.   Id.

On September 10, 2012, Plaintiff's depression and anxiety remained "very high."   (Tr. 365.)   Plaintiff also experienced continued mood swings.   Id.   Plaintiff did not tolerate Saphris

due to grogginess.   Id.   Plaintiff had minimal interest in activities, and continued to isolate herself to her home.   Id.   Dr. Stromsdorfer stopped the Saphris and continued her other medications.   Id.   He noted that Plaintiff "is discouraged and reluctant to try another medication at this time"; he suggested ECT as a potential option.   Id.

On October 1, 2012, Plaintiff's mood was doing somewhat better, but was still up and down.   (Tr. 364.)   Major tensions were occurring as a consequence of her significant other struggling with a gambling problem.   Id.   Plaintiff was contemplating moving out.   Id.   Upon examination, Plaintiff's affect was depressed, but relatively calmer with less lability and no tearfulness.   Id.   Dr. Stromsdorfer assessed a GAF score of 55, and continued Plaintiff's medications.   Id.

On October 22, 2012, Plaintiff's depression and anxiety continued.   (Tr. 363.)   Dr. Stromsdorfer indicated that Plaintiff had obtained a consultation with Adam Sky as recommended for assessment of TMS.   Plaintiff wished to reduce dosages of medications due to lack of effectiveness.   Id.   Dr. Stromsdorfer indicated that a course of TMS with Dr. Sky would be pursued, and Plaintiff's medications would be reduced.   Id.

On November 19, 2012, Plaintiff's anxiety was somewhat worse, as was her insomnia.   (Tr. 362.)   TMS had not been started due to the cost of the treatment.   Id.   Upon examination, Plaintiff's affect was depressed, tearful, and very anxious.   Id.   Dr. Stromsdorfer stated that Plaintiff's dysphoria remained high, and she would attempt to pursue the TMS option with Dr. Sky.   Id.

On December 17, 2012, Plaintiff's mood was slightly better in some ways, but she was still experiencing anxiety attacks.   (Tr. 361.)   Plaintiff's financial stressors remained high.   Id.   She

was attempting to obtain certification for TMS through the providing company.   Id.   Upon examination, Plaintiff's depression and anxiety remained fairly high; her affect was depressed but less tearful, and moderately anxious.   Id.   Dr. Stromsdorfer continued Plaintiff on reduced dosages of medications.   Id.

Plaintiff presented to the emergency room at St. Anthony's Medical Center on December 17, 2012, with complaints of anxiety.   (Tr. 394.)   Plaintiff presented with her mother, and they requested Ativan[17] for treatment of anxiety symptoms.   Id.   Plaintiff reported poor sleep and significant anxiety despite being on the highest dosage of Trileptal.   Id.   Plaintiff noted recent stressors of unemployment, financial hardship, and impending eviction.   Id.   Plaintiff indicated that she was not interested in hospitalization or switching her long-term medications, because she hoped to receive experimental treatment and was optimistic it would be successful.   (Tr. 395.) Plaintiff reported that she did not wish to adjust medications, because she had experienced negative side effects in the past from medications.   Id.   Plaintiff was unable to indicate which medications caused which side effects.   Id.   Upon examination, Plaintiff was anxious and restless, and occasionally tearful, with a labile affect.   (Tr. 396.)   Plaintiff appeared "quite miserable."   (Tr. 397.)   Plaintiff was prescribed Ativan to treat her symptoms, and was discharged to home.   Id.

**Evidence Presented to Appeals Council**

In a letter dated April 2, 2013, Dr. Stromsdorfer stated that he was requesting approval for Plaintiff to receive TMS treatment due to her "continued emotional distress, disability, and

---

[17]  Ativan is indicated for the treatment of anxiety.   See WebMD, http://www.webmd.com/drugs (last visited September 23, 2014).

difficulties either tolerating or responding to medications." (Tr. 412.) Dr. Stromsdorfer stated that Plaintiff has been "struggling with prominent mood difficulties" since the age of eighteen. Id. Dr. Stromsdorfer indicated that he had been treating Plaintiff for a primary diagnosis of bipolar disorder type I since October 14, 2010. Id. Dr. Stromsdorfer stated that Plaintiff had had "minimal episodes of emotional stability with prominent emphasis on severe depressive episodes." Id. He indicated that Plaintiff's anxiety "rapidly fluctuates and becomes intense." Id. The interventions offered by Dr. Stromsdorfer and tried by Plaintiff, included seventeen different psychotropic medications. Id. Dr. Stromsdorfer stated that, although Plaintiff had been working hard to improve her emotional state, she "remains disabled, experiencing ongoing mood swings, low energy, lack of interest in activities, poor focus, crying spells and lack of interest in usual activities." Id. Dr. Stromsdorfer indicated that he last saw Plaintiff on February 25, 2012, at which time she was taking Klonopin, Trileptal, and Paxil. Id. Dr. Stromsdorfer stated that he supported Plaintiff's attempts to receive TMS treatment. Id.

### The ALJ's Determination

The ALJ made the following findings:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2.   The claimant has not engaged in substantial gainful activity since August 5, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.   The claimant has the following severe impairments: bipolar disorder, an anxiety disorder, and a personality disorder (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to work that involves only simple, routine, and repetitive tasks. She should work in a low stress job, defined as work requiring only occasional decision making, only occasional changes in the work setting, no interaction with the public, only casual and infrequent contact with co-workers, and contact with supervisors concerning work duties (when work is being performed up to expectations) occurring no more than three times per workday.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born on March 9, 1982 and was 29 years old, which is defined as a younger individual age 18-49, on the alleged onset date (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from August 5, 2011, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 13-21.)

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits filed on June 4, 2012, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act.

Based on the application for supplemental security income protectively filed on June 4, 2012, the claimant is not disabled under section 1614(a)(3)(A) of the Social

Security Act.

(Tr. 22.)

**Discussion**

**A.      Standard of Review**

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.   See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).   The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.   See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).   Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.   See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).   If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.   See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).   The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.   See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)(citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).   "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."   Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).   The analysis required has been described as a "searching inquiry."   Id.

**B.      Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not

less than 12 months." 42 U.S.C. § 416 (I)(1)(a); U.S.C. § 423 (d)(1)(a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the

physical and mental demands of the past work, the claimant is not disabled.   See id.   If the

claimant cannot perform his or her previous work, the final step involves a determination of

whether the claimant is able to perform other work in the national economy taking into

consideration the claimant's residual functional capacity, age, education and work experience.

See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).   The claimant is entitled to disability benefits only if

s/he is not able to perform any other work.   See id.   Throughout this process, the burden remains

upon the claimant until s/he adequately demonstrates an inability to perform previous work, at

which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform

other work.   See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

    The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a,

416.920a.   The first step requires the Commissioner to "record the pertinent signs, symptoms,

findings, functional limitations, and effects of treatment" in the case record to assist in the

determination of whether a mental impairment exists.   See 20 C.F.R. §§ 404.1520a (b) (1),

416.920a (b) (1).   If it is determined that a mental impairment exists, the Commissioner must

indicate whether medical findings "especially relevant to the ability to work are present or absent."

20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).   The Commissioner must then rate the degree of

functional loss resulting from the impairments in four areas deemed essential to work:   activities

of daily living, social functioning, concentration, and persistence or pace.   See

20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).   Functional loss is rated on a scale that ranges

from no limitation to a level of severity which is incompatible with the ability to perform

work-related activities.   See id.   Next, the Commissioner must determine the severity of the

impairment based on those ratings.   See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).   If the

21

impairment is severe, the Commissioner must determine if it meets or equals a listed mental

disorder.   See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).   This is completed by comparing

the presence of medical findings and the rating of functional loss against the paragraph A and B

criteria of the Listing of the appropriate mental disorders.   See id.   If there is a severe impairment

but the impairment does not meet or equal the listings, then the Commissioner must prepare a

residual functional capacity assessment.   See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## C.    Plaintiff's Claims

Plaintiff argues that the ALJ erred in determining Plaintiff's RFC.   Plaintiff also contends

that the hypothetical question posed to the vocational expert was erroneous.   The undersigned

will discuss Plaintiff's claims in turn.

The ALJ made the following determination with regard to Plaintiff's RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has
> the residual functional capacity to perform a full range of work at all exertional levels but
> with the following nonexertional limitations: the claimant is limited to work that involves
> only simple, routine, and repetitive tasks.   She should work in a low stress job, defined as
> work requiring only occasional decision making, only occasional changes in the work
> setting, no interaction with the public, only casual and infrequent contact with co-workers,
> and contact with supervisors concerning work duties (when work is being performed up to
> expectations) occurring no more than three times per workday.

 (Tr. 15.)

RFC is what a claimant can do despite her limitations, and it must be determined on the

basis of all relevant evidence, including medical records, physician's opinions, and claimant's

description of her limitations.   Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001).

Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all

relevant evidence, a claimant's RFC is a medical question.   Hutsell v. Massanari, 259 F.3d 707,

711 (8th Cir. 2001) (citing Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)).   Therefore, an ALJ

is required to consider at least some supporting evidence from a medical professional.   See Lauer,

245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC);

Casey v. Astrue, 503 F.3d 687, 697 (8th Cir. 2007) (the RFC is ultimately a medical question that

must find at least some support in the medical evidence in the record).   An RFC determination

made by an ALJ will be upheld if it is supported by substantial evidence in the record.   See Cox v.

Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).

Plaintiff argues that the ALJ erred in evaluating the medical evidence from Plaintiff's

treating psychiatrist, Dr. Stromsdorfer.   Plaintiff contends that the RFC formulated by the ALJ is

not, therefore, supported by the medical evidence.   The undersigned agrees.

The ALJ has the role of resolving conflicts among the opinions of various treating and

examining physicians.   Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001).   The ALJ

may reject the conclusions of any medical expert, whether hired by the government or the

claimant, if they are inconsistent with the record as a whole.   Id.   "A treating physician's

opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a

claimant's] case record.'"   Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20

C.F.R. § 404.1527(d)(2)).   However, "[w]hen a treating physician's opinions are inconsistent or

contrary to the medical evidence as a whole, they are entitled to less weight."   Halverson v.

Astrue, 600 F.3d 922, 929-30 (8th Cir. 2010) (internal quotation marks omitted).   The opinion

of a consulting physician, who examines a claimant once, or not at all, generally receives very

little weight.   Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).   The opinion of an examining

physician is generally entitled to more weight than the opinion of a non-examining physician.

20 C.F.R. § 404.1527(d)(1). Under the regulations, the ALJ "will always give good reasons . . . for the weight [he or she] give[s] [a claimant's] treating source opinion." 20 C.F.R. § 404.1527(c)(2).

The ALJ found that Plaintiff's medical records show that "many of the claimant's mental health and functional problems are attributable to life stressors, that she has not been compliant with her treatment, and that she has not pursued possible treatment avenues." (Tr. 16.) The ALJ stated that Plaintiff "functioned fairly well when she was working and had stable finances and personal life," but her "functioning diminished when she reported not working, financial difficulty, and problems in her family and in her relationship with her significant other." (Tr. 17.)

It is true that mental impairments that are situational and do not result in functional limitations are not disabling. See Dunahoo v. Apfel, 241 F.3d 1033, 1039-40 (8th Cir. 2001) (claimant's depression was due to her denial of food stamps and workers' compensation and did not result in significant functional limitations). In this case, however, Plaintiff's mental impairments are not purely situational, and result in significant limitations. Plaintiff was consistently diagnosed with bipolar I disorder and personality disorder not otherwise specified. Plaintiff received regular psychiatric treatment, and was prescribed multiple psychotropic medications to treat these mental impairments. The severity of Plaintiff's symptoms did vary, which is consistent with the nature of mental illness, specifically bipolar disorder.

The ALJ noted that Plaintiff reported struggling with financial strains, including being unemployed, having difficulty finding work, and being denied disability and unemployment benefits. (Tr. 18.) The ALJ stated that Plaintiff's psychiatric problems were caused by these stressors, and that they are not, therefore, disabling. Id. While it is true Dr. Stromsdorfer noted

at times Plaintiff's symptoms were exacerbated due to the situational factors mentioned by the ALJ, the medical record reveals Plaintiff continued to experience symptoms even when she was working. In fact, the ALJ ignores the fact that Plaintiff's jobs were often a source of significant psychiatric distress.

At Plaintiff's initial visit with Dr. Stromsdorfer in October of 2010, he noted that Plaintiff had lost jobs in the past due to her mood lability. (Tr. 309.) On February 7, 2011, Dr. Stromsdorfer indicated that Plaintiff's anxiety was high, she had difficulty accomplishing tasks if her workload exceeded 25 hours, and she had obsessional thoughts about being perfect on her tasks. (Tr. 303.) On May 9, 2011, the frequent changes in Plaintiff's work stress were interfering with her focus and her sleep. (Tr. 300.) Dr. Stromsdorfer advised Plaintiff to obtain a set work schedule. Id. On July 28, 2011, Plaintiff reported that her anxiety had been "very bad" and had caused her to leave work at times. (Tr. 296.) Dr. Stromsdorfer advised Plaintiff to take a leave of absence from work. Id. Plaintiff expressed to her caseworker that she was very concerned about losing her job due to needing time off to handle her medication transition. Id. On February 16, 2012, Plaintiff's level of stress was very high due to working multiple shifts with some sleep deprivation. (Tr. 288.) Plaintiff presented to the emergency room on May 2, 2012, due to increased anxiety and difficulty focusing at work. (Tr. 351.) On June 14, 2012, Plaintiff complained of mood swings and reported that she had discontinued work, because it was overwhelming. (Tr. 369.) Dr. Stromsdorfer indicated that he supported Plaintiff's efforts to obtain disability benefits. Id.

The medical record reveals that Plaintiff experienced psychiatric symptomatology when she was working and that she ultimately stopped working due to these symptoms. Id. Dr.

Stromsdorfer indicated that he supported Plaintiff's efforts to obtain disability benefits due to the dysphoria she continued to experience while working. (Tr. 369.) Thus, the ALJ erred in finding that Plaintiff's psychiatric problems were caused by life stressors, and that Plaintiff "functioned fairly well" when she was working. The ALJ's RFC determination, which is based on his erroneous findings, is not supported by substantial evidence.

The ALJ also found that Plaintiff has not been compliant with her treatment, and that she has not "pursued possible treatment avenues." (Tr. 16.) In support of this finding, the ALJ first noted instances in which Plaintiff had missed scheduled therapy sessions, Plaintiff discontinued therapy, and Plaintiff had missed certain dosages of medications. (Tr. 18.) The ALJ also noted that Dr. Stromsdorfer recommended that Plaintiff consider electroconvulsive therapy as a potential option to control her symptoms. (Tr. 18.) The ALJ stated that Plaintiff instead raised the possibility of undergoing TMS, an "experimental treatment," as an alternative to Dr. Stromsdorfer's recommendation. Id. The ALJ stated that "[a]lthough the records made clear that it was the claimant's own decision to stop her medications and pursue this experimental treatment, the claimant told her counselor that this course of action was directed by Dr. Stromsdorfer, and she also testified at the hearing that Dr. Stormsdorfer had recommended this treatment." (Tr. 19.) The ALJ stated again that Plaintiff's "reports that her psychiatrist recommended this experimental treatment and that she discontinue her medications are not consistent with the medical records." Id. The ALJ found that this inconsistency, in combination with her noncompliance with recommended treatment, "significantly undermines the credibility of the claimant's allegations of disability." Id.

Plaintiff contends that new evidence submitted to the Appeals Council, the narrative

report from Dr. Stormsdorfer, calls into significant question the conclusions reached regarding Plaintiff's compliance with medication treatment.

In a letter dated April 2, 2013, Dr. Stromsdorfer stated that he was requesting approval for Plaintiff to receive TMS treatment due to her "continued emotional distress, disability, and difficulties either tolerating or responding to medications." (Tr. 412.) Dr. Stromsdorfer stated that Plaintiff has been "struggling with prominent mood difficulties" since the age of eighteen. Id. Dr. Stromsdorfer indicated that he had been treating Plaintiff for a primary diagnosis of bipolar disorder type I since October 14, 2010. Id. Dr. Stromsdorfer stated that Plaintiff "has had minimal episodes of emotional stability with prominent emphasis on severe depressive episodes." Id. He indicated that Plaintiff's anxiety "rapidly fluctuates and becomes intense." Id. Dr. Stromsdorfer stated that, although Plaintiff had been working hard to improve her emotional state, she "remains disabled, experiencing ongoing mood swings, low energy, lack of interest in activities, poor focus, crying spells and lack of interest in usual activities." Id. Dr. Stromsdorfer indicated that he last saw Plaintiff on February 25, 2012, at which time she was taking Klonopin, Trileptal, and Paxil. Id. Dr. Stromsdorfer stated that he supported Plaintiff's attempts to receive TMS treatment. Id.

Dr. Stromsdorfer's letter was written after the Appeal's Council denied Plaintiff's request for review on March 29, 2013. (Tr. 1-4.) Plaintiff submitted the new evidence to the Appeals Council, along with a letter requesting that the Appeals Council reconsider its decision. (Tr. 411.) The evidence was added to the administrative record, but there is no record of any further action taken by the Appeals Council. Plaintiff now requests that the matter be remanded to the Commissioner for consideration of the new evidence.

A sentence six remand is authorized in two limited situations: (1) where the Commissioner requests a remand before answering the complaint of a claimant seeking reversal of an administrative ruling, or (2) where new and material evidence is adduced that was for good cause not presented during the administrative proceedings. See 42 U.S.C. § 405(g); Shalala v. Schaefer, 509 U.S. 292, 297 n. 2 (1993). "Material evidence is 'non-cumulative, relevant, and probative of the claimant's condition for the time period for which benefits were denied, and there must be a reasonable likelihood that it would have changed the [Commissioner's] determination.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1025 (8th Cir. 2002) (quoting Woolf v. Shalala, 3 F.3d 1210, 1215 (8th Cir. 1993)).

Here, the undersigned finds that the new evidence is material. The letter was written only four days after the Appeals Council denied review, and approximately six weeks after the ALJ's determination. Dr. Stromsdorfer's letter applies to the period at issue, as he discusses Plaintiff's mental health treatment from October 2010 through February 2013. (Tr. 412.) The letter clarifies that Dr. Stromsdorfer is recommending TMS treatment, and provides detailed reasons for this recommendation. Id. This is significant because the ALJ found that Plaintiff was seeking TMS treatment despite Dr. Stromsdorfer's recommendation that she undergo shock therapy. The ALJ found that Plaintiff was noncompliant with treatment recommendations and discredited her credibility based on this finding. The new evidence contradicts the ALJ's findings that were cited as a basis for the decision to deny benefits. Dr. Stromsdorfer's letter also serves to generally elucidate the severity of Plaintiff's mental impairments during the relevant period. Thus, the new evidence also provides a basis for remand.

**Conclusion**

In sum, the RFC formulated by the ALJ is not supported by substantial evidence on the record as a whole. The ALJ erred in analyzing the medical evidence of record. Specifically, the ALJ erred in finding that Plaintiff's mental health problems were attributable to life stressors, and that that she functioned well while she was working. The ALJ's RFC determination was based on this inaccurate finding. Because the RFC formulated by the ALJ was flawed, the ALJ's determination that Plaintiff was capable of performing other work in the national economy was also erroneous.

The new evidence from Dr. Stromsdorfer serves as an additional basis to remand this matter. In his letter, Dr. Stromsdorfer provides greater clarification regarding the severity of Plaintiff's mental illness during the relevant period, and directly refutes the ALJ's finding that TMS treatment was not recommended by Plaintiff's doctor.

For these reasons, this cause will be reversed and remanded to the ALJ in order for the ALJ to consider the relevant new evidence; formulate a new residual functional capacity for Plaintiff based on the medical evidence in the record and further develop the medical record if necessary; and then to continue with the next steps of the sequential evaluation process. Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of plaintiff in accordance with this Memorandum.

ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 30th day of September, 2014.